**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH**

| | | |
|---|---|---|
| OBATAIYE SCOTT, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 2:16-cv-01672 |
| | ) | |
| vs. | ) | United States Magistrate Judge |
| | ) | Cynthia Reed Eddy |
| | ) | |
| BOBBI JO SALAMON, | ) | |
| SUPERINTENDENT AT SCI- | ) | |
| ROCKVIEW;  THE ATTORNEY | ) | |
| GENERAL OF THE STATE OF | ) | |
| PENNSYLVANIA,  and DISTRICT | ) | |
| ATTORNEY OF WASHINGTON | ) | |
| COUNTY, PENNSYLVANIA, | ) | |
| | ) | |
| Respondents. | | |

**MEMORANDUM OPINION[1]**

**CYNTHIA REED EDDY, United States Magistrate Judge**

**I.    Introduction**

Petitioner, Obataiye Scott, filed the instant *pro se* Petition for Writ of Habeas Corpus eight

(8) years after the judgment in his state conviction became final.  *See* criminal docket filed at No.

CP-63-CR-0000937-2007.  Scott seeks equitable tolling of the Antiterrorism and Effective Death

Penalty Act ("AEDPA") limitations period alleging his severe mental illness affected his ability to

file a timely petition.  (ECF No. 4).  Pending before the Court is Respondents' Motion to Dismiss

Petition for Writ of Habeas Corpus as Untimely Filed. (ECF No. 16).  Scott, through appointed

counsel, filed a response and exhibits (ECF Nos. 64 and 65), to which Respondents filed a Reply

---

[1]    In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a U.S. Magistrate conduct proceedings in this case, including entry of a final judgment.  *See* ECF Nos. 19 and 22.

(ECF No. 100), and Scott filed a counseled Sur-Reply with exhibits (ECF Nos. 108 and 109).  The matter is ripe for disposition.

For the following reasons, the motion to dismiss will be granted, the petition for writ of habeas corpus will be dismissed with prejudice as untimely, and a certificate of appealability will be denied.

## II.    Procedural History

### A.    Pennsylvania Criminal Proceedings in Washington County[2]

On June 5, 2008, Obataiye Scott pled guilty to a negotiated guilty plea before the Honorable John F. DiSalle in the Court of Common Pleas of Washington County, Pennsylvania, to one count each of first degree murder, aggravated assault, and criminal attempt (homicide) at criminal case number CP-63-CR-0000937-2007.  The Commonwealth agreed not to seek the death penalty in exchange for Scott's plea to the charge of first degree murder.  He was sentenced that same day to life imprisonment (without parole) on the first degree murder charge and concurrent sentences of ten to twenty years on the remaining charges.  Throughout his criminal proceedings, Scott was represented by Attorney Gary J. Graminski.  No post-sentence motions were filed and no direct appeal was taken.

---

[2]    Scott was charged in Allegheny County with the shooting and killing of Jerome Childs in Pittsburgh on April 11, 2007.  He pled guilty on June 23, 2008, and was sentenced to a term of life imprisonment without parole to run concurrent with the life sentence that had been imposed on his Washington County conviction. Plea and Sentencing Transcript, 6/23/2008 (ECF No. 65-30). The Allegheny County judgment of conviction is the subject of a separate federal habeas case filed in this Court.  *See Scott v. Garman,* Case No. 2:17-cv-1600.

B.      Pennsylvania PCRA Proceedings[3]

Almost six months after being sentenced, on December 24, 2008, Scott filed a *pro se*

petition for post-conviction collateral relief under Pennsylvania's Post-Conviction Relief Act

("PCRA") in which he asserted that his guilty plea was unlawfully induced and raised an

ineffective assistance of counsel claim. (State Court Record, Doc. 24).   Attorney Jeffrey A. Watson

was appointed to represent Scott during the PCRA proceedings.   On May 19, 2010, Attorney

Watson filed a *Turner/Finley* "no-merit" letter.   (State Court Record, Doc. 28).   That same day,

the PCRA court denied the petition.[4]

Scott, through counsel, timely appealed to the Superior Court. Attorney Watson

subsequently filed with the Superior Court an *Anders*[5] brief and a Motion for Leave of Court to

Withdraw.   On May 11, 2011, Scott filed a *pro se* Brief in the Superior Court.  (ECF No. 109-33).[6]

---

[3]      Respondents provided the Court with the original state court record from Scott's criminal proceedings, *see* docket entry of 3/20/2017, as well electronic copies of the counseled briefs filed with the Pennsylvania Supreme and Superior courts, and a transcript of the plea/sentencing hearing that occurred on June 5, 2008, in the Court of Common Pleas of Washington County.  (ECF No. 31).

[4]      In affirming the dismissal of the PCRA Petition, the Superior Court noted that the PCRA court had improperly failed to issue a Rule 907 notice in violation of Pa.R.Crim.P. 907(1). Superior Court Memorandum, 9/29/201, at pp. 6-7.

[5]      In *Anders v. California*, 386 U.S. 738 (1967), the Supreme Court of the United States indicated that where appellate counsel determined that the appeal is frivolous, counsel need merely to certify that the record had been reviewed and presents no colorable grounds for reversal.

[6]      According to the Affidavit of Jeffrey Shivers, who met Scott sometime around 2006 when they both were incarcerated at SCI-Huntingdon, he was shown a copy of Scott's Superior Court brief by an investigator from the "Federal Defenders, Western District of Pennsylvania [and] I immediately recognized it as my work.   I could tell from the format and the way it looked.   Mr. Scott provided me with the paperwork he had for me to review.   I researched the case law, wrote the brief, and attached exhibits in support of issues that I raised in Mr. Scott's behalf.   I gave the brief to Mr. Scott to submit.   I told him to send it certified mail, return receipt."  (ECF No. 109-34).

On September 29, 2011, the Superior Court affirmed the dismissal of the PCRA petition and granted Attorney Watson's motion to withdraw. (ECF No. 4-1).[7]  *Commonwealth v. Scott*, No. 859 WDA 2010, at p. 6 (Pa. Super. Ct. 9/29/2011).  On March 13, 2012, Scott's Petition for Allowance of Appeal ("PAA") was denied by the Pennsylvania Supreme Court.[8]  Scott did not seek certiorari to the Supreme Court of the United States.

     C.    <u>Federal Habeas Proceedings</u>

On November 4, 2016,[9] over four years after his PAA was denied, the Clerk of Court received the instant Petition for Writ of Habeas Corpus submitted by Scott, through "Next Friend Alexander Joseph Pakalinsky." (ECF No. 1).  The petition was lodged as it did not come with either a Motion for Leave to proceed *in forma pauperis* or the filing fee.  On November 15, 2016, the Clerk received the filing fee and the Petition was docketed. (ECF No. 3).  Scott acknowledges the Petition was untimely filed and requests that the Court equitably toll the limitations period.[10] (ECF No. 3 at pp. 13 and 14).

Respondents were served with the Petition and on January 17, 2017, filed the instant motion to dismiss seeking to have the petition dismissed as untimely. (ECF No. 16).  On February

---

[7]     A complete copy of the Superior Court's Memorandum and Dissenting Memorandum is docketed at ECF No. 31-3, pp. 17 – 38.

[8]     The Pennsylvania Supreme Court docket, of which this Court may judicial notice, reflects that Attorney Watson filed the Petition for Allowance of Appeal. *See* ECF 31-3, Petition for Allowance of Appeal.

[9]     Giving Scott the benefit of the prison mailbox rule, the petition is deemed filed as of October 30, 2016, the date it appears from the document that Scott's Next Friend dated and signed the petition.  *See Houston v. Lack,* 487 U.S. 266 (1988); *Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998).

[10]     In the Petition, Scott seems to argue that the limitations period should be equitably tolled based on (i) his mental illness and (ii) his actual innocence.  As will be discussed further below, counsel for Petitioner <u>only</u> argues that the limitations period should be equitably tolled based on Scott's psychiatric and mental health impairments

14, 2017, the Court granted Scott's request for appointment of counsel and appointed the Federal Public Defender's Office for the Western District of Pennsylvania to represent him. (ECF No. 23). The case then was stayed and administratively closed pending review by Scott's newly appointed counsel.  (*Id*).

On July 13, 2017, Scott's counsel reported that counsel needed time to review discovery and Scott's mental health records prior to responding to the motion.  (ECF No. 33).  In total, Scott's counsel requested twelve extensions to respond to the motion to dismiss.  *See* ECF Nos. 35, 37, 42, 44, 46, 48, 50, 54, 56, 58, 60, and 62.  On September 24, 2019, counsel filed a response to the motion to dismiss and attached voluminous pages of exhibits, totaling 320 pages.  (ECF Nos. 64 and 65). Respondents were ordered to file a reply brief by October 31,  2019 (Errata, 9/26/2019) and then granted an extension until November 30, 2019, to file a Reply Brief.  When that deadline expired without Respondents filing a Reply Brief, the Court ordered Respondents to inform the Court by January 17, 2020, if they intended to file a Reply Brief.  (ECF No. 69).

On January 9, 2020, Respondents filed a motion for psychiatric records and evaluation of Scott. (ECF No. 70).   Scott, through counsel, filed an unopposed motion for extension of time to respond (ECF No. 72), which the Court granted.  Scott's response to Respondents' motion for psychiatric records and evaluation was due by March 5, 2020.  (ECF No. 73).  Scott's counsel then filed six subsequent unopposed motions for extension of time to respond to the motion for psychiatric records and evaluation.  (*See* ECF Nos. 79, 81, 83, 85, 87, and 91).  On September 1, 2021, the Court was informed by Scott's counsel that the parties had reached an agreement by which the Commonwealth would retain a mental health expert to review Scott's expert report (ECF No. 65-38, Report B. Andrew Farrah) and Scott's mental health records. (ECF No. 93).

In light of the parties' agreement, the Court ordered Respondents to file a reply brief to Scott's response to the motion to dismiss by November 1, 2021.  Respondents requested and were granted two extensions of time to file their Reply Brief (ECF Nos. 96 and 98).  The Reply Brief was filed on January 29, 2022, with the only exhibit being the expert report of Bruce A. Wright, M.D.  (ECF No. 100, 100-1).

The case was further delayed by another round of extensions sought by Scott's counsel in which to file a Sur-Reply to Respondent's Reply Brief.  (ECF Nos. 102, 104, and 106.).  Scott filed a counseled Sur-Reply on June 10, 2022. The case was reopened and the stayed lifted on June 15, 2022.  The motion to dismiss is ripe for disposition.

## III.   Discussion

### A.   AEDPA's one-year period of limitation

A habeas petition must be filed in a timely manner. The federal habeas corpus laws were amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and included the following relevant provision:

> (d) (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court. The limitation period shall run from the latest of-
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.

28 U.S.C. § 2244(d); *see Fahy v. Horn*, 240 F.3d 239 (3d Cir. 2001).[11]  The AEDPA limitations period is subject to both statutory and equitable tolling.  *Jones v. Morton,* 195 F.3d 153, 158 (3d Cir. 1999).

---

[11]   The limitations provided in subsections B through D of § 2244(d) are not applicable and need not be addressed.

In analyzing whether a petition for writ of habeas corpus has been timely filed under the one-year limitations period, a federal court must undertake a three-part inquiry. First, the court must determine the "trigger" date for the individual claims raised in the petition. A judgment becomes final at the conclusion of direct review or upon the expiration of time for seeking such review. *Id.; see Gonzales v. Thaler*, 565 U.S. 134, 150 (2012). Second, the court must determine whether any "properly filed" applications for post-conviction or collateral relief were pending during the limitations period that would toll the statute under § 2244(d). Third, the court must determine whether any of the other statutory exceptions or equitable tolling should be applied on the facts presented.

The parties agree that because Scott did not file a direct appeal, his judgment became final thirty days after his judgment of sentence. Pa. R. App. P. 903(c)(3). His judgment, thus, became final on July 5, 2008, and for all the claims raised in this habeas petition, the "trigger" date for purposes of the one-year period under §2244(d)(1)(A) is July 5, 2008. As a result, Scott needed to file his federal habeas petition within one year of that date.[12] Since Scott did not file the instant petition until 2016, the petition is facially untimely and must be dismissed unless Scott can show that the limitations period should be tolled, either statutorily or equitably. Scott argues that he is entitled to equitable tolling as extraordinary circumstances prevented him from timely filing his petition.[13]

---

[12]    The last day of the one-year period, July 5, 2009, fell on a Sunday, so the petition would have been due the following Monday, July 6, 2009. *See* Fed. R. Civ. P. 6(a)(1)(C).

[13]    Scott's limitation period was interrupted because he filed a timely PCRA Petition. The time during which a "properly filed" PCRA petition is pending is excluded from the one-year calculation. 28 U.S.C. § 2244(d)(2). Scott's judgment became final on July 5, 2008. He filed a timely PCRA petition, which tolled the AEDPA statute of limitations, but 172 days had passed before the statute of limitations was tolled. The tolling period ended on March 14, 2002, the day after his PAA was denied. Scott had only 193 days left to file his federal habeas petition, or until

B.   Equitable Tolling

The habeas limitations period can be tolled in rare circumstances when "principles of equity would make [its] rigid application unfair." *Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80. 89 (3d Cir. 2013).   A petitioner seeking equitable tolling bears the burden of establishing that (1) some extraordinary circumstances prevented him from exercising his rights and (2) he has diligently pursued his claims.  *Holland v. Florida*, 560 U.S. 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).  "This conjunctive standard requires showing both elements before we will permit tolling,"  *Sistrunk v. Rozum*, 674 F.3d 181, 190 (3d Cir. 2012), and the petitioner bears the burden of establishing both elements.  *Wallace v. Mahanoy*, 2 F.4th 133, 143 (3d Cir. 2021).

There are "no bright lines in determining whether equitable tolling is warranted in a given case."  *Pabon v. Mahanoy*, 654 F.3d 385, 399 (3d Cir. 2011); *Wallace,* 2 F.4th at 144  "This equitable doctrine is used sparingly, the assessment is flexible and the particular circumstances of the petitioner must be taken into account."  *Wallace*, 2 F.4th at 144.  *See also LaCava v. Kyler*, 398 F.3d 271, 275 (3d Cir. 2005) (stating that "courts should be sparing in their use of the doctrine" and limit its application only to the "rare situation where [it] is demanded by sound legal principles as well as the interests of justice.").

Here, counsel argue that Scott is entitled to equitable tolling because his "psychiatric and mental impairments are 'extraordinary circumstances' that stood in the way of filing and 'he had been pursuing his rights diligently'." Sur-Reply at 1-2 (quoting *Holland,* 560 U.S. at 650).  (ECF No. 108).  Respondents argue that Scott is not entitled to equitable tolling because the record

September 24, 2012.  Even giving Scott the benefit of the prisoner mailbox rule, the instant Petition was filed well beyond the time for filing a federal petition had expired.

evidence rebuts his claim that there was no period during the relevant time period in which he could timely file his federal habeas petition due to the severity of his mental illness. The resolution of this issue depends on whether Scott can establish (i) any extraordinary circumstances and (ii) that he acted with reasonable diligence that would meet the judicially established criteria for disregarding the limitations period pursuant to the doctrine of equitable tolling.

### 1. Extraordinary Circumstances[14]

The Court of Appeals for the Third Circuit has held that equitable tolling may be appropriate "where a petitioner's mental incompetence affected the petitioner's ability to file a timely habeas petition." *McKeithan v. Varner,* 108 F. App'x 55, 58 (3d Cir. 2004) (citing *Nara v. Frank*, 264 F.3d 310, 320 (3d Cir. 2001), *rev'd on other grounds by Carey v. Saffold*, 536 U.S. 214 (2002)). That said, "mental incompetence is not a *per se* reason to toll a statute of limitations. Rather, the alleged mental incompetence must somehow have affected the petitioner's ability to file a timely habeas petition." *Nara*, 264 F.3d at 320 (internal citations omitted).

In *Wallace,* the Court of Appeals considered whether a mentally ill petitioner faced extraordinary circumstances sufficient to excuse a "decade-plus delay" in filing his habeas petition.[15] The Court of Appeals reaffirmed that to warrant equitable tolling, a petitioner's "alleged mental incompetence must somehow have affected the petitioner's ability to file a timely habeas

---

[14] The Court recognizes that the parties did not have the benefit of the Court of Appeals' precedential decision in *Wallace v. Mahoney,* 2 F.4th 133 (3d Cir. 2021), at the time the Respondents' Motion to Dismiss and Scott's counseled Response were filed. However, post-*Mahoney*, the Respondents filed a Reply Brief and Scott filed a counseled Sur-Brief, in which both parties address the *Wallace* decision and its applicability to this case.

[15] Wallace's petition was due on January 7, 2002, but the petitioner "contend[ed] that his mental illness so hampered his ability to think clearly that he could not reasonably have been expected to file for federal habeas relief at any time prior to September 2015." *Wallace*, 2 F.4th at 136. Unlike here, Wallace did not file a timely PCRA petition which would have tolled the one-year AEDPA statute of limitations.

petition," though he need not show that it made his filing impossible.  *Id*. at 144, 145 n.18 (citing *Nara,* 264 F.3d at 320).   "[T]he relevant inquiry for purposes of assessing extraordinary circumstances is how severe an obstacle the circumstance creates with respect to meeting AEDPA's one-year deadline."   *Id*. at 144 (internal quotations and alteration omitted). Additionally, the *Wallace* court described these four factors as a "starting point" to establish that the petitioner genuinely suffers from mental illness:

> (1) whether the petitioner was adjudicated incompetent and, if so, when did the adjudication occur in relation to the habeas statutory period;
>
> (2)  whether the petitioner was institutionalized for his mental impairment;
>
> (3)  whether the petitioner handled or assisted in other legal matters which required action during the federal limitations period; and
>
> (4) whether the petitioner supported his allegations of impairment with extrinsic evidence such as evaluations and/or medications.

*Wallace*, 2 F.4th at 144-45 (quoting *Champney v. Sec'y Pennsylvania Dept. of Corr.*, 469 Fed. Appx. 113, 118 (3d Cir. 2012)).  Our Court of Appeals explained that courts must consider "the totality of the circumstances in determining whether the record supports [the petitioner's claim] that he had no period of sufficiently good health . . . during which he could have pursued a federal habeas petition."  *Id*. at 145.

After reviewing Wallace's medical records and other record evidence, the Court of Appeals determined that Wallace genuinely suffered from mental illness, but he also had "periods of relative stability" where he was "capable of pursuing legal remedies[.]"  *Id*. at 145.  The appellate court noted in particular that "Wallace was able in 2013 to pursue state post-conviction relief – despite his many medications and his claimed decline in mental health."  *Id*. at 148.

Here, there is no debate that Scott has a long history of mental illness. At issue is whether the record sufficiently supports Scott's claim that he experienced <u>no</u> periods of sufficiently good

mental health during the relevant time frame during which he could have filed his federal habeas petition.

The initial determination that must be made then is what is the "relevant time frame" at issue. Respondents argue the relevant time frame is the "entirety of 2008 – 2016." Reply at ¶ 21. Scott argues that it cannot be the entirety of 2008 – 2016 as the limitations period was tolled during the pendency of Scott's PCRA proceedings. According to Scott, the "relevant time frame" is the 172 days between the date the judgment became final (July 5, 2008) and the filing of the PCRA petition (December 23, 2008), and then resumes after the conclusion of the PCRA proceedings in 2012 until the habeas petition was filed in 2016. Sur-Reply at 4.

The Court agrees with Scott and finds that the relevant time period is (i) July 5, 2008 (the date the judgment became final) to December 23, 2008 (the date the PCRA petition was filed) (approximately 172 days) and (ii) March 14, 2012 (the day after the PAA was denied) to October 30, 2016 (when the federal habeas petition was deemed filed). The time during the pendency of the timely filed PCRA petition tolled the limitations period.

Starting with the four *Champney* factors, it does not appear that Scott can satisfy the first factor because the record does not reflect that he has ever been adjudicated incompetent. He easily satisfies the second factor as the record reflects he has been both voluntarily and involuntarily committed at various times and has required psychiatric care throughout his incarceration. He does not satisfy the third factor because, during the federal limitations period, he handled or assisted in his PCRA proceedings, including filing documents in the Superior Court, as well as corresponded with his counsel and the state court.

As to the fourth *Champney* factor, the record evidence describes Scott has having a limited education, IQ scores ranging from 70[16] to 88,[17] voluntary and involuntary hospitalizations for mental illness, and drug and alcohol abuse. The Court finds that Scott's history of mental illness has been sufficiently documented to require further consideration of his ability to file a timely petition. *Wallace*, 2 F.4th at 145; *Nara*, 264 F.3d at 230.[18] The Court now turns to whether the record evidence shows changes and fluctuations in Scott's mental health over the relevant period which affected his ability to file a timely petition.

    (a)  <u>Records prior to 2008</u>

The record evidence reflects that Scott experienced childhood abuse, and has a history of juvenile offending and school maladjustment. He began using marijuana as a teenager and by the time he was 16 was using cocaine. "He failed ninth grade and dropped out of school in tenth grade." (ECF No. 100-1 at p. 4).[19] In 1991, at the age of 19, he found his mother dead of a suspected drug overdose. Dr. Farrah reports that after this,

> there were significant changes in Mr. Scott's behavior and demeanor. Family report he was frequently pacing for hours, displayed extreme paranoia, was prone to hallucinations, was quick to anger, and quick to threaten others with no provocation. He not only displayed paranoid delusions, but racing thoughts and

---

[16]    Dr. Farrah opined that an IQ of 70, places Scott "below normal, yet not meeting criteria for intellectual disability, thus possessing below average cognitive ability, but the deficits are not as severe as intellectual disability (IQ below 70). He is thus categorized as below average IQ, or "borderline intellectual functioning." Expert Report of B. Andrew Farah, M.D. (ECF No. 65-38 at pp. 10-11).

[17]    Dr. Wright's expert report notes that Scott's "DIQ was 93, as measured by the Otis Lenon test administered in 1979).

[18]    Scott contends that his post-arrest statements to the police provide further proof of his mental illness, as the statements are replete with Scott's delusional ramblings.

[19]    There is reference in the DOC records that Scott tested at a fifth-grade reading level.

rambling disjointed speech.  These symptoms were exacerbated by an escalation in illicit drug use.

(ECF No. 65-38 at p. 4).

The record evidence reflects that Scott has a family history of mental illness, with a paternal uncle being institutionalized for psychosis, and Scott's sister and his son both being diagnosed with bipolar disorder.[20]  *See* Expert Report of Dr. Farrah (ECF No. 65-38).  Outpatient and hospital records indicate both voluntary and involuntary admissions.  Between 1992 and 1995, Scott was hospitalized five times at Western Psychiatric Institute and Clinic ("WPIC"); one time at Forbes Hospital in 1992; and at least once at St. Francis Hospital.  Dr. Wright noted that these hospitalizations were often precipitated by psychosis and suicidal/homicidal ideation.  During these hospitalizations, Scott's diagnosis included: adjustment disorder with depressed mood; depressive disorder; rule/out Bipolar disorder; Psychotic disorder, not otherwise specified; cocaine dependence; alcohol abuse; personality disorder, not otherwise specified with antisocial traits; and possible malingering.

In 1996, Scott entered a guilty plea to a robbery charge at No. 1995-cr-557, in the Court of Common Pleas of Fayette County, and was sentenced on May 29, 1996 to a term of imprisonment for a period not less than 2 years nor more than 4 years.  On September 4, 1996, Scott was transferred from "CDCC"[21] to SCI-Cresson "due to need of add'l services per chief psychologist central office."  (ECF No. 65-9).

---

[20]     The report also noted that a parental grandfather required "some mental health care as an adult, but the details of that treatment are lost to family members"; a paternal aunt was "known to hallucinate . . . and likely went undiagnosed and untreated"; and his mother was "thought to suffer from bipolar disorder."  ECF 65-38.

[21]     The DOC website indicates "CDCC" is the Camp Hill Diagnostic and Classification Center.  *See* DOC Policy No. 11.1.1 (July 10, 2019).  https://www.cor.pa.gov/ (last reviewed 12/21/2023).

On July 7, 1997, Scott pled guilty to drug possession charges in the Court of Common Pleas of Fayette County and was sentenced to a term of imprisonment of not less than 9 months nor more than 24 months to run consecutively to the sentence imposed on May 29, 1996.  (ECF 65-10 at p. 2).

(b)  Mayview State Hospital Commitment

Following Scott's formal arraignment in Washington County in 2007, the trial court, upon motion by Attorney Graminski, ordered Scott committed to Mayview State Hospital Forensic Unit ("Mayview") for a period of ninety (90) days to determine Scott's competency.  Order of July 9, 2007 (ECF No. 65-20).  Scott, however, was not transferred to Mayview until October 11, 2007.

Scott' initial assessment on October 17, 2007, reflects that he had impaired judgment and impaired insight, intellectual functioning current level was average/low average, but he could make his needs known.  (ECF No. 109-4, at pp. 1-2).

On December 27, 2007, Laszlo Petras, M.D., Forensic Psychiatrist, corresponded with Scott's trial counsel noting that Scott was diagnosed on admission:

> with Psychosis, NOS [Not Otherwise Specified], and Depression with vague suicidal thoughts.  The patient was extremely anxious, depressed, up all night, was unable to concentrate, and had some auditory hallucinations and delusional thought process, mostly paranoia.  With aggressive treatment the patient improved; however, he is still anxious and dysphoric.  He has some difficulty sleeping as well as obsessive thinking pattern.  He does have some suspiciousness which has been less pronounced than in the past.  At this point there is still question if the patient will be able to work effectively in his own defense.  Therefore, I am requesting some extension of his commitment to further improve his mental status and hopefully have him free of any signs and symptoms of mental illness.

Petition for Psychiatric Evaluation, Exh. B. On January 7, 2008, the trial judge extended Scott's commitment to Mayview for another ninety (90) days.  State Court Record, No. 17.  The February 28, 2008, evaluation prepared by Dr. Petras reported that,

> In the early part of January [Scott] showed a significant turn around in his mental status, attitude and behavior. . . Mental status throughout January and early February shows he was alert, oriented times three, cooperative with no signs of any thought distortions or auditory hallucinations.  In the recent days, however, the patient again presented himself to the interviewer complaining about increased voices which were not there recently. . . . He also stated that because of his difficulties he has recently had a problem sleeping, which hasn't been a problem for many weeks.  The patient at this point, however, is felt to have achieved maximum benefit from this hospitalization. Again, the authenticity of this recently increased psychotic feature cannot be verified, but he is very much aware that his commitment will be expiring soon as far as the treatment is concerned at Mayview State Hospital. . . .
>
> Recommendations and aftercare plans:  the patient at present is felt to have achieved maximum benefit from this hospitalization. He is alert, oriented and cooperative, taking care of himself. He works with staff members effectively and is able to get along with others on the unit without any behavior problem. He will be returned to the Washington County Jail as soon as possible for further processing of his legal case.

Mayview State Hospital Summary, dated 2/28/2008 (ECF No. 65-21 at pp. 2 – 4).  The evaluation did not render Scott incompetent to continue with the pending legal proceedings.  On March 12, 2008, the Discharge Note from Mayview signed by Dr. Petras states that Scott's "[d]iagnosis, prognosis, and recommendation remain as stated in the Summary dated 2/28/2008." (ECF No. 65-21, at p. 1).  On March 12, 2008, the trial judge ordered Scott returned to the Washington County Correctional Facility as his evaluation was complete.  *Id.*

   (c)  <u>June 5, 2008 – Plea and Sentencing Hearing</u>

  Scott signed the Guilty Plea Colloquy Explanation of Defendant's Rights form on June 5, 2008.  On the form, he responded affirmatively to these questions:

  6. Have you discussed with your attorney the elements of each charged offense?

  7. Have you discussed with your attorney the factual basis of each charged offense?

  8. Have you discussed with your attorney how the facts in your case prove the elements of each charged offense?

  24. By pleading guilty, you are admitting you committed the crime.  You are stating

that you do not challenge the charges against you. Do you fully understand this?

> 41. Are you doing this on your own free will?

And Scott responded in the negative to these questions:

> 49. Have you ever had any physical or mental illness that would affect your ability to understand these rights or affect the voluntary nature of your plea?
>
> 50. Are you presently taking any medication which might affect your thinking or free will.

State Court Record, Guilty Plea Colloquy Explanation of Defendant's Rights.

Additionally, Scott's trial counsel signed a Certification of Defense Counsel, which states

in relevant part:

> (3) he knew "no reason why the defendant cannot fully understand everything that is being said and done here today."
>
> (4) "The defendant read the [Plea Colloquy Explanation of Defendant's Rights] in my presence and appeared to fully understand it; I have gone over the form completely with the defendant, explained all of the items of the form, and answered any questions he or she had.
>
> (5) "I see no reason why the defendant cannot and is not knowingly, intelligently and voluntarily giving up his or her rights to trial and pleading guilty."

State Court Record, Certification of Defense Counsel.

During the plea hearing, the trial court asked Scott the following:

> THE COURT: Mr. Scott, you completed this guilty plea colloquy that I'm holding in my hand?
>
> MR. SCOTT: Yes, Sir. Yes, Your Honor.
>
> . . .
>
> THE COURT: Did you have any questions about this form?
>
> MR. SCOTT: No, sir.

After reciting a description of the charges, the trial court asked:

16

THE COURT:  And you're here to accept liability for this?

MR. SCOTT:  Yes, Your Honor.

. . .

THE COURT:  At the time of your arraignment, the Court, upon motion of your attorney, Mr. Graminski, ordered you to be evaluated at Mayview State Hospital to determine your competency and/or any psychiatric defenses that you have; is that right?

MR. SCOTT:  Yes, Your Honor.

THE COURT:  And you spent some time there, correct?

MR. SCOTT:  Yes, Your Honor.

THE COURT:  Approximately six months?

MR. GRAMISKI:  Six months.

THE COURT: Right?

MR. SCOTT:  Yes, sir.

. . .

MR. GRAMINSKI:  [ ] I would take the opportunity to indicate that the time we did the formal arraignment, you may recall that Mr. Scott's demeanor was dramatically different than it is today.  I think it's safe to say that the time that was spent at Mayview helped Mr. Scott personally, but it also helped the District Attorney and the Court to make a better determination as to what should happen with him.

I would like to say that in all of his years and all of the troubles that Mr. Scott had as a young man, he was never evaluated in such a thorough fashion. . . .

Transcript, Guilty Plea, 6/5/2008 (ECF No. 65-29).

The trial court also ascertained which medications Scott was taking at the time of the entry of the guilty plea and then asked whether those medications affected Scott's ability to

17

understand the proceedings.[22]  Scott responded negatively.  The trial court also inquired if the medications affected Scott's ability to review and understand the written colloquy, to which Scott again responded negatively.  Transcript, 6/5/2008, p. 19.

Before the sentence was imposed, Scott was asked by the trial judge if he would like to say anything and he replied:

> MR. SCOTT:  Yes, sir.  I would just like to say for my apologies to not only the family of Shawn Allen, but the whole City of Washington.  I would like to ask to be forgiven by these people, by you all just for – just coming here with the nonsense that's cost me my life and cost me my freedom.  I will very dearly miss my freedoms.
>
> I don't want nothing else but to just be forgiven and to try to understand my situation.  I didn't mean to fall into the state of mind that I fell into the night that I shot these people.  It's just a big mess, and I just pray to God that I would be forgiven by you people and God himself.
>
> . . .
>
> Yes, again, I would just like to say that my heart hurts just like the family hurt that I have caused.  Like I said, I admit to shooting them.  I just wish there would be a way for them to forgive me and try to understand that I suffer the same – some of the pain because I lost my brother and my cousin all mixed up in this same thing here.  So I did understand. If anyone thinks I don't understand, I do understand.  And my heart goes out.  Again, I apologize to everyone involved.

Transcript, 06/05/2008 (ECF No. 65-29 at pp. 21-22, 35-36).[23]

---

[22]    Scott stated he was on the following prescription medications:  Lithium, Risperdal, Clozapine, and a heart burn medication.  Transcript, 6/5/08, at p. 18-19. (ECF No. 65-29).

[23]    During the colloquy, the trial court stated it had received "the report of Dr. Petraeus" (sic) which indicated "that although you do suffer from certain psychiatric conditions, that you were competent to participate in your trial and that you did understand the nature of your actions." Transcript, at p. 7, Lines 13 – 19.  Scott's counsel points out, the record does not contain a report from Dr. Petras stating that Scott is "competent."  Counsel represents they have requested and reviewed the Mayview records and the only report from Dr. Petras is the February 28, 2008 summary in which Dr. Petras reports that Scott has "achieved maximum benefit from this hospitalization." (ECF Nos. 4-1 and 65-21).

      (d)     DOC Psychiatric Records  - June 2008 through November 2016

SCI-Pittsburgh/Cambria/Camp Hill Records

"A Brief Psychiatric Evaluation Form" prepared on July 5, 2008, when Scott was housed at SCI-Pittsburgh, indicates Scott had no current complaints and he denied any "A/V hallucations." His Axis I diagnosis was listed as (1) polysubstance and (2) [illegible] malingering.  ECF No. 109-4.

It appears Scott then was transferred to SCI-Camp Hill as a psychologist at SCI-Camp Hill conducted a Psychological Assessment on July 14, 2008.  That assessment indicates Scott "requires significant monitoring by the Psychiatric Review Team (PRT)." (ECF No. 65-11).  On July 30, 2008 and August 27, 2008, Scott reported that he was "doing pretty good."  (ECF No. 109-6).  In July 2008, a psychological assessment report showed Scott's IQ score was 70, his intellectual rating was borderline, and his Axis I diagnosis was "Psychotic Disorder NOS, Polysubstance Abuse and Antisocial Personality Disorder."  In September 2008, Scott requested and was referred for counseling "based on his comments that he has been 'taunted and abused by memories of being molested."  He also expressed desire to "remain safe" from cellmates.  (ECF No. 65-13).  On September 22, 2008, he reported doing okay, but "could be a little bit more calm." (ECF No. 109-6).

SCI-Huntingdon Records

The Psychological Report, dated June 23, 2009, states that Scott is "currently diagnosed with Post Traumatic Stress Disorder, Drug and Alcohol Dependence and Anti Social Personality Disorder."  (ECF No. 109-8).  Records indicate he was referred for individual counseling by his counselor for an appointment on October 7, 2008, but he did not attend that session.  It was noted that he was "at least partially compliant with his medical regime" and that "he has not exhausted

19

all avenues available to him, such as individual counseling or mental health group that would assist him in developing appropriate coping strategies." *Id*.

The records show that Scott next was seen on July 20, 2009, at which time it was reported that his thought process was "organized" and his thought content was "normal;" on September 25, 2009, it was reported that he appeared to be "upset," his thought process was "perseverates re 'wrongs done'" and his thought content was "paranoid;" on June 17, 2010, it was reported that his thought process was "good oriented (undecipherable) – has some agenda" and his thought content "(-) hallucinations !!!;" on September 3, 2010, it was reported that his thought process was "logical, goal directed" and his thought content was "some paranoia – trying to assassinate my character;" and on November 1, 2010, it was reported that his thought process was "some tangentiality" and his thought content was "no delusions elicited." (ECF No. 65-14 through 65-18).  During this time, his Axis I diagnosis was at times Bipolar Disorder, Antisocial Personality Disorder, Post Traumatic Stress Disorder, Polysubstance Abuse, Paranoid Schizophrenia, and Chronic Paranoid Schizophrenia.

The Outpatient Psychiatry Progress report dated December 8, 2009, states that Scott is depressed, is making statements that "the devil haunts me, he is everywhere."  Scott was vague when asked specifies about his psychiatric history – changes history.  The progress note also indicates that Scott was "malingering."  (ECF No. 109-10).

The March 19, 2010, referral for diagnostic impressions as related to a possible move within the institution, reflects that Scott's insight was limited by mood and inner conflicts:

> His thoughts and behaviors appear motivated by an intense spirituality & preoccupation, frustrations and conflicts that arise out of obsessional spiritual thinking and personal dissatisfaction for his personal inconsistencies in his daily living. . . . Mr. Scott has not required any Psych Services until now, relative to his pending move off A unit.  I do not recommend Mr. Scott's move off the unit until

> he has managed via strict rigidity, routine and familiarity.  A move to E Unit would
> destabilize him and require increased staff involvement from E-Unit team.

(ECF No. 109-11).   The November 1, 2010, Outpatient Psychiatry Progress Note was unremarkable reflecting that Scott stated that "I don't consider it medication because I'm not sick," he reported sleeping well, appetite was good, and he reported no side effects from his medication. His Axis I diagnosis was Chronic Paranoid Schizophrenia. (ECF No. 109-13).

The August 5, 2011, monthly mental health contact reported noted that Scott had entered the RHU a few days earlier on July 27, 2011 and maintained that he was "locked up w/o good cause."  The counselor noted that "Mr. Scott seems to have a good plan for maintaining his MH stability & reads, exercises, prays, meditates" and the goal was to "keep Mr. Scott emotionally/ mentally stable."  (ECF No. 109-14).

### SCI-Houtzdale Records

Scott was transferred to SCI-Houtzdale in or around October 19, 2011.  (ECF No. 109-15). He reported having a history of depression, but denied hearing voices or having thoughts to harm himself or others.  Psychiatric follow up care was needed, "routine."  (*Id.*) On November 22, 2011, the SCI-Houtzdale psychiatry staff reported that Scott was non-compliant with his prescribed medications as he stated that he "went to church and was healed."  He agreed to follow up with staff at any sign of a problem.  (ECF Nos. 65-19; 109-16).  The Outpatient Psychiatry Progress Note dated December 19, 2011, reflects that Scott denied any concerns, but it was noted that he was not compliant with his medications.[24]  (ECF Nos. 65-34; 65-36 at p. 11).

The Outpatient Psychiatry Progress Notes from January 2012 – September 2014, all consistently report that Scott was reporting that he was doing well and denied having any concerns.

---

[24]     The handwritten psychiatry progress notes of Shella Khatri, M.D., psychiatrist, are extremely difficult to decipher.  (ECF No. 65-36).

In December 2011, January 2012, April 2012, and April 2013, compliance issues were noted. (ECF Nos. 65-36 at pp. 4 – 11; 109-17, 109-18).  The July 3, 2013, Outpatient Psychiatry Progress Notes indicates Scott reported feeling "pretty good," his judgment and insight were reported as "fair," and he was scheduled for a follow up visit in three months. (ECF No. 109-19).

SCI-Rockview Records

The monthly Medication Logs from April 2012 – February 2017 consist of 150 pages and reflect a wide range of medications, some prescribed by the Medical Department, and others prescribed by the Psychiatry Department.  (ECF No. 65-35).[25]  It is impossible to discern from these logs why medications were discontinued, or why the dosages fluctuated.

The record evidence reflects that by June 15, 2015, Scott had been transferred to SCI-Rockview.  The first record evidence from SCI-Rockview is an Outpatient Psychiatric Progress Note dated June 15, 2015.  It was reported that Scott was feeling well with his medications and "relies on his Christian faith to cope," and his thought content was reported as "hyper religious." The plan was to continue with medication and "decrease access to care."  (ECF Nos. 65-36; 109-20).  Scott had an individual session with the Mental Unit on July 13, 2015.  The Notes from that session state that Scott's anxiety appeared elevated and he "spoke about his paranoia about going to general population.  Stated he feels targeted because he was originally thought to be involved in an incident at his prior institution. . . . He denied a need for psychotropic medications."  (ECF 65-36 at p. 1).  He was to be follow up with Psychiatry in thirty (30) days.  (ECF No. 109-21).

---

[25]      The Court notes that "SCI Rockview" is listed on every page of the medication log as Scott's facility. But this appears to conflict with the Outpatient Psychiatric Progress Notes from January 2012 – September 2014 which reflect that Scott was housed at SCI-Houtzdale during this time. There is no explanation for this inconsistency in the record; it may be as simple as this is the facility that printed the Medication Log.

On July 27, 2015, Scott was released from RHU to general population. The staff assessment at that time was "IQ 88; medications: no psych meds. RHU release. . . ." Scott reported he was motivated to obtain his GED and wanted to improve his relationship with his children. (ECF No. 109-22).

The Outpatient Psychiatry Progress Notes from December 2011 through June 2015 all indicate that Scott reported he was feeling well. (ECF No. 65-36). For example, on March 27, 2014, the psychiatrist's notes indicate the "psychosis NOS (resolved)" or "stable." (ECF No. 65-36 at pp. 6, 7, 8, and 9). On October 20, 2015, however, Scott reported without elaboration that he was "having crazier thoughts" but said he was doing better with medication. The psychiatrist noted that Scott was not displaying any overt signs or symptoms of psychosis (ECF Nos. 65-37 at p. 5; 109-23 at p. 1) and his thought processes were recorded as "logical" and judgment was "fair." (ECF Nos. 65-37 at p. 5; 109-23 at p. 1). [26]

In 2016, Scott began to report having persecutory delusions. In January 2016, it was noted on the Psychiatry Progress Notes that "Pt is delusional about being 'persecuted.' However, he keeps this in check and functions fairly well in GP." (ECF Nos. 65-37 at p. 4; 109-24).[27] In February 3, 2016, Scott was placed in the Medication Noncompliance Group. (ECF Nos. 65-36 at p. 2; 109-25). On March 17, 2016, Scott was seen at his cell door at which time he refused a "1:1 session" as he reported no issues or concerns. (ECF No. 109-26).

By May 2016, however, it appears from the records that Scott's mental health began deteriorating. On May 12, 2016, it was reported that he was delusional as he was stating that he

---

[26] The record reflects that Scott saw the psychiatrist via telemedicine unit for routine Psychiatric follow-up visit. (ECF No. 109-23).

[27] The record reflects that Scott saw the psychiatrist via telemedicine unit for routine Psychiatric follow-up visit. (ECF No. 109-24).

felt he was constantly being watched.  He was to have a follow up visit in eight (8) weeks.  (ECF No. 109-27).[28]   At the follow-up visit on July 18, 2016, the psychiatrist reviewed Scott's medications with him, Scott stated he did not feel he needed an adjustment, it was reported that Scott was compliant with his medications, but did not acknowledge that they helped him.  It was also reported that Scott had "persecutory and delusional thoughts, long standing, possibly locked – no problems in processing other issues.  He reports he copes with prayers and meditation."  His judgment/insight was reported as "compromised by his persecutory thinking.  No out of control behaviors."  (ECF Nos. 65-37 at p. 3; 109-28).

During an Individual Recovery Plan session on July 28, 2016, Scott reported that he was "doing OK," but "I think I may need my meds tweaked up a little."  (ECF No. 109-29).  His reported individual goals were to be transferred closer to home and to maintain mental health and physical stability.  It was reported he was "91.5% compliant." *Id.*

On November 14, 2016, Scott stated that he was "having battles in his mind.  When he takes [illegible] it  help to block.  And need help -  tired of hearing voices."  (ECF Nos. 65-37).  *See also* Mental Unit Contact Note, monthly report 11/14/2016 (ECF No. 109-32) (same).  His thought process was reported as "low."

On January 4, 2017, Scott signed a Release from Responsibility for Medical Treatment stating that he was refusing psychiatric treatment.  (ECF No. 109-32).

---

[28]      The record reflects that Scott saw the psychiatrist via telemedicine unit for routine Psychiatric follow-up visit. (ECF No. 109-27).

(e)      Correspondence from March 2010 – June 2014[29]

The record contains eight (8) pieces of correspondence written during this time frame: two letters written on behalf of Scott by fellow prisoner Jeffrey Shivers and six letters written by Scott himself.   A brief description of each follows.

(i)  On March 10, 2010, Jeffrey Shivers, submitted a typewritten "Letter of Request" to the Office of the Clerk of Court of Washington County on behalf of Scott.  In the letter, Mr. Shivers states he has been requested to assist Scott "due to his mental deficiency and diminish capacity" in obtaining legal documents and specifically requests a copy of the Court's docket sheet from Scott's criminal case.  The letter is signed by Scott. (ECF No. 65-22).

(ii)  On May 17, 2010, Jeffrey Shivers sent a two-page typewritten letter on behalf of Scott to Attorney Alan R. Patterson, III, an attorney representing Scott in his PCRA proceedings pending in Allegheny County.[30] Mr. Shivers states that Scott has given his permission for Attorney Patterson to have Scott's mental health records be a part of the Amended PCRA petition Attorney Patterson will be filing.  The correspondence notes that Scott could understand legal concepts and assist in the preparation of his PCRA petition.  The letter is signed by Scott. (ECF No. 65-23).

(iii)  In an undated handwritten letter written by Scott to Attorney Patterson, postmarked October 4, 2011, Scott informs Attorney Patterson that he is in the RHU "away from my helpers" and states, "I don't want to get time barred. . . . I see it says I have only 20 days to respond but I

---

[29]      Scott's counsel explains that they made repeated attempts to obtain the files from Scott's counsel in his criminal case in Washington County to no avail, except for an incomplete discovery package provided by trial counsel.  According, this record does not contain copies of Scott's correspondence to his Washington County trial counsel.

[30]      Scott was represented by Attorney J. Richard Narvin during his criminal proceedings in Allegheny County.  Attorney Patterson was appointed to represent Scott during his PCRA proceedings in Allegheny County.

don't know how to respond sir." Twice in this correspondence Scott states that he does not want to get "time barred." (ECF No. 65-24).

(iv) In a handwritten letter January 16, 2014, to Attorney Patterson, Scott asks for copies of the transcripts from his Allegheny County and Washington County cases "as I am trying to study and do some research on my own." (ECF No. 65-25).

(v) In an undated handwritten letter, postmarked April 7, 2014, to Attorney Patterson, Scott states, "I want to take your advice and file for Federal Habeas Relief as soon as possible in addition to AEDPA. How do I go about getting my transcripts if you cant send them sir?" (ECF No. 65-26).

(vi) In a unsigned, typewritten letter dated April 22, 2014, Scott wrote the Clerk of Courts, Washington County, requesting copies of "1) Preliminary, 2) Colloquies and 3) Sentencing Notes." A handwritten notation on this letter states: "Sent 4-25-14. copy of sentence, copy of crim. comp. There was no colloquies files." Original State Court Record.

(vii) In a typewritten letter dated June 1, 2014 to Attorney Patterson, Scott requests several documents from his state court proceedings in Allegheny County. (ECF No. 65-27).

(viii) And the final letter in the record is a typewritten letter dated June 22, 2014, from Scott to the law firm of Gross & Patterson again requesting copies of several documents from Scott's state court proceedings in Allegheny County. (ECF No. 65-28).

(f)     The Expert Reports

(i)     B. Andrew Farrah, M.D.[31]

---

[31]     Dr. Farrah's report dated 9/20/2019 is docketed at ECF No. 65-38; his Rebuttal Report dated 6/10/2022 is docketed at ECF No. 109-36.

In support of his claim that his mental illness affected his ability to file a time habeas petition, Scott has submitted the expert report of Andrew Farrah, M.D., the Medical Director and Chief of Psychiatry, of High Point Division of Wake Forest University.  (ECF No. 65-39).

Dr. Farrah concludes that:

> To a reasonable degree of medical certainty, based on this exhaustive review, and two interviews, I have concluded that Mr. Scott was then, and remains in, the grip of delusional beliefs, and intermittently suffering from hallucinations.  Mr. Scott continues to suffer from psychotic symptoms and an impaired ability to comply with deadlines for filings related to these proceedings.

In his Rebuttal Report, Dr. Farrah concludes:

> Thus, the totality of circumstances documented in the medical record from 2008 through 2017 indicate no sustained periods of symptom-free status, non-delusional thinking, or intact insight.  The medical record is replete with documentation of consistently limited insight and judgment, intermittent compliance with medication and appointments, persistent and treatment-resistant psychotic symptoms such as hallucinations and delusions, multiple medication adjustments and/or recommendations, hyper-religiosity, and frequent denial of illness.

(ECF No. 109-36).

### (ii)    Bruce A. Wright, M.D.

On the other hand,  Bruce A. Wright, M.D., Respondents' expert,  opined based on a reasonable degree of medical certainty that:

> • Mr. Scott does not have a severe thought process disorder.  Specifically, although Mr. Scott's DOC records occasionally document tangential or perseverative thoughts, there is no indication that he had persistently disorganized or disjointed thoughts.

> • As suggested in the WPIC, MSH and DOC records, Mr. Scott may have malingered some of his psychiatric symptoms.  Dr. Farah opined that Mr. Scott does not present as a typical malingerer because his delusions have been consistent over time and his validity scales on psychological testing were within normal limits. These factors do not, however, exclude the possibility that Mr. Scott feigned or intentionally magnified his symptoms.  In fact, Mr. Scott's records unequivocally document that his delusions have not been consistent with time, and, Mr. Scott has

been diagnosed with antisocial personality disorder, which is generally associated with lies, deception and manipulation.[32]

● There is no evidence that Mr. Scott's thought processes, thought content, cognition, judgment or insight were persistently impaired to such an extent that he was incapable of adhering to the deadlines for submission of the Petition for Writ of Habeas Corpus. Correspondence from Mr. Scott to Attorney Patterson confirms that Mr. Scott had the capacity to understand legal concepts, including time constraints associated with legal filings.

(ECF No. 100-1 at p. 13).

     (g)     <u>Scott has not established that extraordinary circumstances prevented him from filing a habeas petition for the entirety of the relevant time period</u>

The record evidence amply demonstrates that Scott has a well-documented and extensive history of mental illness that has plagued him. The record evidence also indicates that, while in DOC custody, Scott has not been admitted for psychiatric observation and psychiatrists have not seen him daily; rather the records reflect he was seen at times monthly, other times at eight-week intervals, and at other times at 90-day intervals.

After a thorough combing of the extensive documentary evidence provided by the parties, as well as a review of the competing opinions of the experts, the Court finds that Scott has not presented sufficient evidence that extraordinary circumstances affected his ability to file a timely petition <u>at any time</u> during the relevant time period. The Court finds that the record reflects that Scott has had periods of relative stability during the relevant time period in which he could have filed a timely petition.[33]

---

[32]    Dr. Wright notes that he was not granted access to interview Mr. Scott and "[a]n examination of Mr. Scott may have helped to clarify this issue." (ECF No. 100-1 at p. 13).

[33]    Because the Court has identified periods of longer than a year in which Scott has failed to demonstrate the existence of extraordinary circumstances, the Court "need not engage in the intricate counting" that is required to compute any hypothetical tolling period. *See Wallace*, 2 F.4th at 148 n. 20 (citing *Schlueter v. Varner*, 384 F.3d 69, 77 n.12 (3d Cir. 2004).

i. July 2008 – September 2009

From July 2008 – September 2009, the records show that Scott was in a period of relative stability. For example, in July 2008, Scott appropriately answered all the questions asked of him during the Plea and Sentencing proceeding. The plea and sentencing hearing transcript reflects that Scott was coherent and intelligent during his exchange with the sentencing judge. There is no indication in the transcript that Scott was experiencing any hallucinations or that his thoughts were disorganized at that time.

In December 2008, Scott filed a *pro se* PCRA petition. As the PCRA petition demonstrates, he was sufficiently capable of pursuing his legal rights to prepare a PCRA petition and mail it to state court and there is no basis in the record from which the Court can conclude that he was rendered incapable of mailing a similar petition to federal court. *See Robinson v. Nash*, No. 07-4547, 2008 WL 6714835 (E.D. Pa. 2008) (noting that petitioner who was able to mail and file PCRA petition and subsequent appellate filings in the state courts was sufficiently capable of pursuing legal rights to prepare and mail a similar petition to federal court).

However in 2009, while housed at SCI-Huntingdon, the records indicate Scott's period of relative stability was beginning to decline. By September 2009, the records show that Scott was "upset" and spoke about suffering paranoia.

ii. March 2010 – October 2015

On March 10, 2010, Scott, assisted by another prisoner, wrote the Clerk of Court of Washington County requesting documents relating to his criminal case and on May 17, 2010, the same prisoner sent a two page letter to Scott's PCRA attorney regarding the preparation of an Amended PCRA petition. The next year, on May 11, 2011, Scott submitted a *pro se* brief to the

Superior Court.    On October 4, 2011, Scott wrote his PCRA attorney in which he twice stated that he did not want to get "time barred."

Further, the records from January 2012 – June 2015 indicate that Scott was doing well and needed only "routine" follow-up psychiatric care.  It was during this period of relative stability that Scott again wrote again to his now-former PCRA attorney:  in January of 2014 he asked for a copy of the transcripts from his Allegheny County and Washington County cases; and in April 2014, he again asked his former PCRA counsel about obtaining transcripts and stated that he wanted to file "for Federal Habeas Relief" as soon as possible.  Also in April 2014, he wrote the Clerk of Court of Washington County requesting copies of court documents.

In June 2014, he twice wrote his former PCRA attorney again requesting various "notes," discovery material and court documents.

In July 2015, the records indicate Scott's anxiety appeared elevated attributable to an upcoming transfer to general population.

The records show that Scott's period of relative stability appears to have come to an end in October 2015.  On October 20, 2015, it was reported that Scott was experiencing "crazier thoughts but better with medication" and by 2016 he was regularly reporting persecutory delusions.  On October 30, 2016, through a "Next Friend," Scott filed the instant petition.

iii.  Assistance from Others

The Court notes that some of Scott's court papers and correspondence were drafted by fellow inmates.  *See* Affidavit of Alexander Joseph Pakalinsky, dated 5/20/2022, stating that Mr. Pakalinsky wrote Scott's federal habeas petition (ECF No. 109-35); and Affidavit of Jeffrey Shivers, 6/9/2022, stating that Mr. Shivers wrote Scott's Superior Court brief (ECF No. 109-34). The Court of Appeals noted in *Wallace* that "the ability to seek assistance and work with others to

obtain legal relief is, in our view, worthy of consideration in assessing Wallace's equitable tolling claim." *Wallace,* 2 F.4th at 145 n. 17.

The Court has therefore considered this assistance but notes that, like the petitioner in *Wallace*, Scott drafted at least some of his submissions on his own.  And the correspondence authored by Scott all reflect that Scott was aware of his past criminal proceedings, he specifically asked for transcripts and other documents from his criminal proceedings, and notably expressed his concern to his attorney that he did not want to be time barred from pursuing federal habeas relief.

For these reasons, the Court finds that the record evidence is insufficient to support Scott's claim that extraordinary circumstances prevented him from pursuing legal relief for the entire period for which he has seeks tolling.

2.      Reasonable Diligence

Even concluding that extraordinary circumstances may have prevented Scott from filing his habeas petition during certain periods of the relevant time period, the Court finds that Scott was insufficiently diligent in preserving his federal rights during those periods of relative stability, specifically from around March 2010 to October 2015.  The record reflects that in May 2010, Mr. Shivers wrote Scott's PCRA counsel regarding the preparation of the Amended PCRA Petition which was to be filed in the Court of Common Pleas of Allegheny County; in May 2011, Scott filed a *pro se* brief with the Superior Court; six months later in October 2011, Scott corresponded with his former PCRA counsel referencing his desire not to be "time barred;" in January 2014, he wrote his former PCRA attorney requesting copies of his trial transcripts; in April 2014, he again wrote his former PCRA attorney stating he wanted to file his federal habeas petition as soon as possible and he also wrote to the Clerk of Court, Washington County, asking for copies of court

documents; in June 2014, he wrote his former PCRA attorney again requesting copies of various court documents. Yet he waited until October 2016 to file the instant petition.

Under the circumstances of this case, the Court finds that during those periods of relative stability Scott did not act in a reasonably diligent fashion.

> C.    Request for Evidentiary Hearing

In his request for relief, Scott requests that the AEDPA statute of limitations be tolled and his habeas petition be deemed timely filed or, in the alternative, the Court to conduct an evidentiary hearing on all disputed issues of fact. Sur-Reply at p. 23 (ECF No. 108). Given that the Court has found that substantial documentary evidence in the record supports the Court's "conclusion that [Scott's] mental illness did not pose a sufficiently severe obstacle to his pursuit of legal remedies for several years," *Wallace*, 2 F.4th at 136, the Court finds that an evidentiary hearing is not necessary.

## IV.    Certificate of Appealability

Section 102 of AEDPA, which is codified at 28 U.S.C. § 2253, governs the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Applying that standard here, the Court concludes that reasonable jurists would not find it debatable that the claims

in the petition are time-barred and that Scott is not entitled to equitable tolling.  Consequently, to the extent one is needed, a certificate of appealability will be denied.

V.      Conclusion

For these reasons, the motion to dismiss will be granted and the petition for writ of  habeas corpus will be dismissed with prejudice.  Further, a certificate of appealability will be denied.  The Court does not reach this conclusion lightly; only after a painstaking review of all the documentary evidence submitted has the Court concluded that Scott has not established his entitlement to equitable tolling.  A separate Order follows.

Dated:  December 21, 2023

BY THE COURT:


s/Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge


cc:     All Counsel of Record
        (via ECF electronic notification)